## NEW YORK *v.* P. J. VIDEO, INC., DBA NETWORK VIDEO, ET AL.

No. 85–363.   Argued March 4, 1986—Decided April 22, 1986

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, and O'CONNOR, JJ., joined.

MARSHALL, J., filed a dissenting opinion, in which BRENNAN and STE-VENS, JJ., joined, *post*, p. 884.

*John J. DeFranks* argued the cause for petitioner. With him on the briefs was *Richard J. Arcara.*

*Paul John Cambria, Jr.*, argued the cause and filed a brief for respondents.*

JUSTICE REHNQUIST delivered the opinion of the Court.

This case concerns the proper standard for issuance of a warrant authorizing the seizure of materials presumptively protected by the First Amendment. Respondents P. J. Video, Inc., and James Erhardt were charged in the village of Depew, New York, Justice Court with six counts of obscenity in the third degree under § 235.05(1) of the New York Penal Law.[1] Respondents moved to suppress five videocassette movies that had been seized from respondents' store, and that formed the basis for the obscenity charges

---

*Charles B. Ruttenberg* and *James P. Mercurio* filed a brief for the Video Software Dealers Association as *amicus curiae* urging affirmance.

[1] Section 235.05(1) (McKinney Supp. 1986) provides:

"A person is guilty of obscenity in the third degree when, knowing its content and character, he:

  "1. Promotes, or possesses with intent to promote, any obscene material . . . ."

"Obscenity in the third degree is a class A misdemeanor."

The statutory definition of "obscenity," which is derived from *Miller* v. *California*, 413 U. S. 15 (1973), appears at § 235.00(1) (McKinney 1980):

". . . Any material or performance is 'obscene' if (a) the average person, applying contemporary community standards, would find that considered as a whole, its predominant appeal is to the prurient interest in sex, and (b) it depicts or describes in a patently offensive manner, actual or simulated: sexual intercourse, sodomy, sexual bestiality, masturbation, sadism, masochism, excretion or lewd exhibition of the genitals, and (c) considered as a whole, it lacks serious literary, artistic, political, and scientific value. Predominant appeal shall be judged with reference to ordinary adults unless it appears from the character of the material or the circumstances of its dissemination to be designed for children or other specially susceptible audiences."

against respondents, on the ground that the warrant authorizing the seizure was issued without probable cause to believe that the movies were obscene. The Justice Court granted the motion and dismissed the informations under which respondents were charged, and both the County Court of Erie County and the New York Court of Appeals affirmed. 65 N. Y. 2d 566, 483 N. E. 2d 1120 (1985). We granted certiorari to resolve the conflict between the decision of the New York Court of Appeals in the instant case and the decisions in *Sequoia Books, Inc.* v. *McDonald*, 725 F. 2d 1091 (CA7 1984), and *United States* v. *Pryba*, 163 U. S. App. D. C. 389, 502 F. 2d 391 (1974), cert. denied, 419 U. S. 1127 (1975). 474 U. S. 918 (1985). We now reverse the judgment of the Court of Appeals.

The obscenity charges against respondents arose out of an investigation by the Erie County District Attorney's Office. Investigator David J. Groblewski was assigned to review 10 videocassette movies that had been rented from respondents' store by a member of the Erie County Sheriff's Department.[2] Groblewski viewed the movies in their entirety, and executed affidavits summarizing the theme of, and conduct depicted in, each film. The affidavits were attached to an application filed by the village of Depew Police Department for a warrant to search respondents' store.

A justice of the New York Supreme Court issued the warrant, authorizing the search of the store and the seizure of the movies. The warrant was executed the next day and, according to a sworn, itemized inventory statement, the police seized 1 or 2 copies of each of the 10 movies. A total of 13 videocassettes were seized. The justice who had issued the warrant ordered that the videocassettes be temporarily

---

[2] The 10 movies were entitled "California Valley Girls," "Taboo II," "Taboo," "All American Girls," "Debbie Does Dallas," "Body Magic," "Deep Throat," "Every Which Way She Can," "Filthy Rich," and "Little Girls Blue."

retained by the police as evidence for trial. See N. Y. Crim. Proc. Law §§ 690.05–690.55 (McKinney 1984).

Respondents ultimately were charged in the village of Depew Justice Court with violating the New York obscenity laws with respect to only 5 of the 10 movies. The affidavits describing these five movies appear in full in the Appendix to this opinion.[3] Respondents moved for suppression of the seized videocassettes, alleging that the warrant authorizing their seizure was not supported by probable cause because the issuing justice had not personally viewed the movies. The Justice Court granted the motion and dismissed the informations under which respondents were charged, and on the State's appeal the County Court of Erie County affirmed.

The New York Court of Appeals likewise affirmed, although on a different theory than that of the Justice Court. According to the Court of Appeals, "there is a higher standard for evaluation of a warrant application seeking to seize such things as books and films, as distinguished from one seeking to seize weapons or drugs, for example (*Roaden* v. *Kentucky*, [413 U. S. 496], 504 [1973]; *Marcus* v. *Search Warrant*, 367 U. S. 717, 730–731 [1961]). In applying the [Fourth] Amendment to such items, the court must act with 'scrupulous exactitude' (*Stanford* v. *Texas*, 379 U. S. 476, 481–485 [1965]; *see also, Maryland* v. *Macon*, 472 U. S. 463 [1985])." 65 N. Y. 2d, at 569–570, 483 N. E. 2d, at 1123 (footnote omitted). Using this "higher" probable-cause standard to review the affidavits submitted in support of the warrant application, the Court of Appeals stated:

"Many of the scenes described contain explicit sexual activity, patently offensive by any constitutional standard, but the allegations of the affidavits do not indicate whether they constitute all, most or a few of the scenes

---

[3] The five movies that formed the basis for the obscenity charges against respondents were "California Valley Girls," "Taboo II," "Taboo," "All American Girls," and "Debbie Does Dallas."

presented in the films. . . . The descriptions of the action are not supplemented by references to the narrative or dialogue of the films and the affiant attempted to describe the 'character' or 'theme' of the movies by settings having nothing to do with the plot . . . . He made no attempt to reveal the story line (or lack of one) of the films or demonstrate that their 'predominant appeal' was to prurient interest. In short, none of the affidavits permit an inference that the scenes described are more than a catalog of offensive parts of the whole." *Id.*, at 570–571, 483 N. E. 2d, at 1124.

The Court of Appeals concluded that the affidavits did not contain sufficient information to permit the issuing justice, "applying contemporary community standards, to judge the films as a whole and determine that they are within the statutory definitions of obscenity and thus are not entitled to constitutional protection." *Id.*, at 572, 483 N. E. 2d, at 1124 (footnote omitted). One judge dissented, arguing that the affidavits contained enough information for the issuing justice "to reasonably believe that the video movies were obscene as legislatively defined." *Id.*, at 573, 483 N. E. 2d, at 1125 (Jasen, J., dissenting).[4]

---

[4] Respondents argue that the decision of the New York Court of Appeals rested on adequate and independent state grounds, namely, provisions of the New York Constitution and various state-court decisions, and that we therefore lack jurisdiction to review that decision. We disagree. As we explained in *Caldwell* v. *Mississippi*, 472 U. S. 320 (1985):

"[W]e will not assume that a state-court decision rests on adequate and independent state grounds when the 'state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion.'" *Id.*, at 327, quoting *Michigan* v. *Long*, 463 U. S. 1032, 1040–1041 (1983).

Here, the New York Court of Appeals cited the New York Constitution only once, near the beginning of its opinion, and in the same parenthetical also cited the Fourth Amendment to the United States Constitution. Moreover, the Court of Appeals repeatedly referred to the "First Amend-

We have long recognized that the seizure of films or books on the basis of their content implicates First Amendment concerns not raised by other kinds of seizures. For this reason, we have required that certain special conditions be met before such seizures may be carried out. In *Roaden* v. *Kentucky*, 413 U. S. 496 (1973), for example, we held that the police may not rely on the "exigency" exception to the Fourth Amendment's warrant requirement in conducting a seizure of allegedly obscene materials, under circumstances where such a seizure would effectively constitute a "prior restraint." In *A Quantity of Books* v. *Kansas*, 378 U. S. 205 (1964), and *Marcus* v. *Search Warrant*, 367 U. S. 717 (1961), we had gone a step farther, ruling that the large-scale seizure of books or films constituting a "prior restraint" must be preceded by an adversary hearing on the question of obscenity. In *Heller* v. *New York*, 413 U. S. 483 (1973), we emphasized that, even where a seizure of allegedly obscene materials would not constitute a "prior restraint," but instead would merely preserve evidence for trial, the seizure must be made pursuant to a warrant and there must be an opportunity for a prompt postseizure judicial determination of obscenity. And in *Lee Art Theatre, Inc.* v. *Virginia*, 392 U. S. 636 (1968), we held that a warrant authorizing the seizure of materials presumptively protected by the First Amendment may not issue based solely on the conclusory allegations of a police officer that the sought-after materials are obscene, but instead must be supported by affidavits setting forth specific facts in order

---

ment" and "Fourth Amendment" during its discussion of the merits of the case, strongly indicating that it believed that its decision was governed by federal law. Finally, although the Court of Appeals cited several state-court decisions, the only citations appended to the crucial language quoted in the text were to the federal decisions in *Roaden* v. *Kentucky*, 413 U. S. 496 (1973), *Marcus* v. *Search Warrant*, 367 U. S. 717 (1961), *Stanford* v. *Texas*, 379 U. S. 476 (1965), and *Maryland* v. *Macon*, 472 U. S. 463 (1985). We conclude, in the absence of a "plain statement" to the contrary, that the decision of the Court of Appeals was premised on federal, not state, law.

that the issuing magistrate may "focus searchingly on the question of obscenity." *Marcus, supra,* at 732; see also *Stanford* v. *Texas,* 379 U. S. 476, 486 (1965).[5]

The New York Court of Appeals construed our prior decisions in this area as standing for the additional proposition that an application for a warrant authorizing the seizure of books or films must be evaluated under a "higher" standard of probable cause than that used in other areas of Fourth Amendment law. But we have never held or said that such a "higher" standard is required by the First Amendment. In *Heller,* we said:

> "[S]eizing films to destroy them or to block their distribution or exhibition is a very different matter from seizing a single copy of a film for the *bona fide* purpose of preserving it as evidence in a criminal proceeding, particularly where, as here, there is no showing or pretrial claim that the seizure of the copy prevented continuing exhibition of the film. If such a seizure is pursuant to a warrant, *issued after a determination of probable cause by a neutral magistrate,* and, following the seizure, a prompt judicial determination of the obscenity issue in an adversary proceeding is available at the request of any interested party, the seizure is constitutionally permissible. . . .

> *"The necessity for a prior judicial determination of probable cause* will protect against gross abuses . . . ." 413 U. S., at 492–493 (emphasis added; footnotes omitted).

---

[5] Contrary to the position apparently taken by the Justice Court in the instant case, we have never held that a magistrate must personally view allegedly obscene films prior to issuing a warrant authorizing their seizure. See *Lee Art Theatre, Inc.* v. *Virginia,* 392 U. S., at 637. On the contrary, we think that a reasonably specific affidavit describing the content of a film generally provides an adequate basis for the magistrate to determine whether there is probable cause to believe that the film is obscene, and whether a warrant authorizing the seizure of the film should issue.

We think that this passage from *Heller*, emphasizing the requirement that the magistrate determine probable cause as a means of safeguarding First Amendment interests, and eschewing any suggestion that the standard of probable cause in the First Amendment area is different than in other contexts, suggests that we saw no need for the latter requirement. In our view, the longstanding special protections described above, and enunciated in cases such as *Roaden, A Quantity of Books, Marcus, Heller,* and *Lee Art Theatre,* are adequate to ensure that First Amendment interests will not be impaired by the issuance and execution of warrants authorizing the seizure of books or films. We think, and accordingly hold, that an application for a warrant authorizing the seizure of materials presumptively protected by the First Amendment should be evaluated under the same standard of probable cause used to review warrant applications generally.[6]

---

[6] Respondents contend that the seizure in the instant case was not limited to only one copy of each film, but instead extended to all copies of the films that the police were able to find during their search of respondents' store. According to respondents, the seizure had the effect of severely restricting public access to the films, and thereby constituted a "prior restraint." Respondents therefore argue that this case is properly governed not by *Heller* v. *New York,* 413 U. S. 483 (1973), but by *Roaden* v. *Kentucky, supra,* where this Court stated that the seizure of an allegedly obscene film, under circumstances where the seizure "brought to an abrupt halt an orderly and presumptively legitimate . . . exhibition" of the film, "calls for a higher hurdle in the evaluation of reasonableness." *Id.,* at 504.

We reject this contention. Our reference in *Roaden* to a "higher hurdle . . . of reasonableness" was not intended to establish a "higher" standard of probable cause for the issuance of a warrant to seize books or films, but instead related to the more basic requirement, imposed by that decision, that the police not rely on the "exigency" exception to the Fourth Amendment warrant requirement, but instead obtain a warrant from a magistrate who has "focus[ed] searchingly on the question of obscenity.'" *Id.,* at 506, quoting *Marcus* v. *Search Warrant, supra,* at 732.

We also note that the burden is on the defendant to make a pretrial showing of a "substantial restraint" if he wishes to escape the rule of *Heller, supra,* that a mere seizure to preserve evidence does not impose on

That standard was recently set forth by this Court in *Illinois* v. *Gates*, 462 U. S. 213 (1983):

> " '[T]he term "probable cause," ' . . . means less than evidence which would justify condemnation . . . . It imports a seizure made under circumstances which warrant suspicion.' [*Locke* v. *United States*, 7 Cranch 339, 348 (1813).] . . . Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision.
>
> .    .    .    .    .
>
> "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing,]' [*Jones* v. *United States*, 362 U. S. 257, 271 (1960),] that probable cause existed." *Id.*, at 235, 238–239.

Applying the *Gates* standard to the affidavits in the instant case, we think it clear beyond peradventure that the warrant was supported by probable cause to believe that the five films at issue were obscene under New York law. Respondents concede that the affidavits describing the five films adequately established probable cause with respect to the second of the three elements of obscenity under the statute, namely, that the movies depicted "in a patently offensive manner" the various kinds of sexual conduct specified in the statute. See N. Y. Penal Law § 235.00(1)(b) (McKinney 1980). Our review of the affidavits convinces us that the issuing justice also was given more than enough information to conclude that there was a "fair probability" that the movies satisfied

the State a duty to conduct an adversary hearing of the sort described in *Marcus, supra.* Respondents made no such pretrial showing in this case.

the first and third elements of the statutory definition, namely, that the "predominant appeal [of the movies] is to the prurient interest in sex," and that the movies "lac[k] serious literary, artistic, political, and scientific value." See N. Y. Penal Law §§ 235.00(1)(a), (c) (McKinney 1980). As Judge Jasen of the Court of Appeals noted in his dissent in the present case:

> "Each of the affidavits describing the films clearly state at the outset that 'the *content* and character of the above mentioned video movie is as follows.' Inasmuch as the magistrate was reviewing affidavits describing movies which were advertised by defendants as 'adult cassette movies,' it was reasonable for him to believe that the affidavits faithfully and accurately described the substance of each movie as a whole. Each affidavit describes the numerous acts of deviate sexual intercourse and the objectification of women occurring in each film which the majority concede to be offensive. Each film is of relatively short duration. Manifestly, the acts described in each movie consume a substantial time span. Thus, the magistrate may reasonably have concluded that the described, successive acts of deviate sexual intercourse pervaded each film. When the title of each movie is considered together with its plot and setting, its general theme and serious value, if any, may reasonably be discerned. The films were described in each of the five nonconclusory affidavits in such a fashion as to permit the magistrate to focus searchingly on the issue of obscenity. Under these circumstances, there was a reasonable basis for the magistrate to authorize the seizure of the films in question." 65 N. Y. 2d, at 580, 483 N. E. 2d, at 1130 (emphasis in original).

We believe that the analysis and conclusion expressed by the dissenting judge are completely consistent with our statement in *Gates* that "probable cause requires only a prob-

ability or substantial chance of criminal activity, not an actual showing of such activity." 462 U. S., at 244, n. 13. We hold that, evaluated under the correct standard of probable cause, the warrant was properly issued and the videocassettes of the five movies should not have been suppressed. The judgment of the New York Court of Appeals is accordingly reversed, and the cause remanded to that court for further proceedings not inconsistent with this opinion.

*It is so ordered.*

## APPENDIX TO OPINION OF THE COURT

### *AFFIDAVIT*

STATE OF NEW YORK )
COUNTY OF ERIE ) SS:
CITY OF BUFFALO )

DAVID J. GROBLEWSKI, being duly sworn, deposes and says:

I am presently a Confidential Criminal Investigator assigned to the Erie County District Attorney's Office and prior to this, a member of the New York State Police for approximately 25 years.

On September 26th, 1983 I viewed the video tape movie "CALIFORNIA VALLEY GIRLS," which was rented on September 20th, 1983, from Network Video, 5868 Transit Road, Depew, New York. This movie was rented by Detective Sergeant Vincent Costanza, a member of the Erie County Sheriff's Department. This movie was viewed in my office starting at 12:00 Noon and lasted until 1:33 P.M.

The content and character of the above mentioned video movie is as follows: Six white females, approximately 18 to 25 years of age, are unemployed and attempt to make a living by

becoming prostitutes. The first scene is a bedroom scene where two females are involved in love making, fondling and cunnilingus. The second scene depicts a white male and a white female having intercourse in the back of a van. The third scene is a house scene where six girls, all white females are introduced to the art of love making. One male, approximately 35 years of age, is teaching the girls the art of fellatio with each one of them performing this act on him. The next scene is a bedroom scene in a home where a husband and wife, a white male and a white female, alone with a girl, a white female, perform various sexual acts which include intercourse, fellatio, anal intercourse and cunnilingus. The movie ends with some lesbianism where the wife performs cunnilingus on the girl while she performs fellatio on the husband and they engage in intercourse and anal intercourse.

[Signature]
David J. Groblewski
Confidential Criminal
Investigator

Subscribed and sworn to
before me this [21] day
of November, 1983.

[Signature]
Notary Public

*AFFIDAVIT*

STATE OF NEW YORK )
COUNTY OF ERIE ) SS:
CITY OF BUFFALO )

DAVID J. GROBLEWSKI, being duly sworn, deposes and says:
I am presently a Confidential Criminal Investigator assigned to the Erie County District Attorney's Office and

prior to this, a member of the New York State Police for approximately 25 years.

On September 23rd, 1983, I viewed the video tape movie "TABOO II," which was rented on September 20th, 1983, from Network Video, 5868 Transit Road, Depew, New York. This movie was rented by Detective Sergeant Vincent Costanza, a member of the Erie County Sheriff's Department. This movie was viewed in my office starting at 9:00 A.M. and with several interruptions lasted until 12:12 P.M.

The content and character of the above mentioned video movie: The theme of the movie is a middle-class neighborhood where a home is the place where all the sexual acts are performed. The movie starts with a brother and sister, a white male and white female, fondling each other. The second scene is another house scene where a white male and white female are giving a rubdown to a white female. The sexual acts that follow include cunnilingus and fellatio. There is also intercourse and the scene closes with the male placing his penis between the girl's breasts and ejaculating into and over her mouth. In another scene there is some incestuous type activity between the brother and the sister where again fellatio and intercourse are performed. At one point during the movie the mother enters the bedroom and observes the two performing the sexual acts and becomes depressed about the situation. In a later scene the son and his mother are on a couch where they become involved in sexual acts of intercourse and fellatio. The movie closes with the mother and father asleep in their bedroom at which time the daughter enters and sleeps next to her father, where they perform incestuous acts of intercourse, and she performs fellatio on her father.

[Signature]

Subscribed and sworn to before me
this [21] day of November, 1983

[Signature]
Notary Public

*AFFIDAVIT*

STATE OF NEW YORK )
COUNTY OF ERIE        ) SS:
CITY OF BUFFALO     )

DAVID J. GROBLEWSKI, being duly sworn, deposes and says:

I am presently a Confidential Criminal Investigator assigned to the Erie County District Attorney's Office and prior to this, a member of the New York State Police for approximately 25 years.

On September 29th, 1983, I viewed the video tape movie "TABOO," which was rented on September 27th, 1983 from Network Video, 5868 Transit Road, Depew, New York. This movie was rented by Detective Sergeant Vincent Costanza, a member of the Erie County Sheriff's Department. This movie was viewed in my office starting at 11:00 A.M. and lasted until 11:55 A.M. and watched again commencing at 1:42 P.M. and lasting until 2:23 P.M.

The content and character of the above mentioned video movie is as follows: The first scene is a bedroom scene where two white females and one white male perform various acts of fellatio, cunnilingus and intercourse. The second scene is a house party scene where many white males and white females are involved in various acts of intercourse, fellatio and cunnilingus. There is also a scene where females perform acts of cunnilingus on each other. The movie portrays at one point a bedroom scene with a white male, the son, laying in bed naked, at which time his mother, a white female enters the room. She makes love to him and incestuous acts of intercourse, placing of the penis between her breasts, ejaculation and cunnilingus are performed.

[Signature]
David J. Groblewski
Confidential Criminal
Investigator

882

Subscribed and sworn to
before me this [21] day
of November, 1983

[Signature]
Notary Public

## *AFFIDAVIT*

STATE OF NEW YORK )
COUNTY OF ERIE    ) SS:
CITY OF BUFFALO    )

DAVID J. GROBLEWSKI, being duly sworn, deposes and says:

I am presently a Confidential Criminal Investigator assigned to the Erie County District Attorney's Office and prior to this, a member of the New York State Police for approximately 25 years.

On September 28th, 1983, Detective Sergeant Vincent Costanza, a Member of the Erie County Sheriff's Department and I viewed the video tape movie "ALL AMERICAN GIRLS," which was rented on September 27th, 1983 from Network Video, 5868 Transit Road, Depew, New York. This movie was viewed in my office starting at 11:35 A.M., and lasted until 1:00 P.M.

The content and character of the above mentioned video movie is as follows: The theme of the movie is a home of one of the six girls, all white females who had previously attended high school and were meeting for a reunion. The first scene is two girls in a room performing acts of lesbianism, namely cunnilingus on each other. They are met by a white male and they perform acts of fellatio on him, have intercourse and all leave the room. Throughout the movie the girls reminisce about their high school days with each one depicting her sexual acts with her male partner. The sex-

ual acts which followed included intercourse, fellatio and cunnilingus.

[Signature]
David J. Groblewski
Confidential Criminal
Investigator

Subscribed and sworn to
before me this [21] day
of November, 1983

[Signature]
Notary Public

## AFFIDAVIT

STATE OF NEW YORK )
COUNTY OF ERIE       ) SS:
CITY OF BUFFALO     )

DAVID J. GROBLEWSKI, being duly sworn, deposes and says:

I am presently a Confidential Criminal Investigator assigned to the Erie County District Attorney's Office and prior to this, a member of the New York State Police for approximately 25 years.

On October 3rd, 1983, Detective Sergeant Vincent Costanza, a member of the Erie County Sheriff's Department and I viewed the video tape movie "DEBBIE DOES DALLAS," which was rented on September 30th, 1983, by Vincent Costanza from Network Video, 5868 Transit Road, Depew, New York. This movie was viewed in my office starting at 2:50 P.M. and lasted until 4:23 P.M.

The content and character of the above mentioned video movie is as follows: The theme of the movie is a girl moving out west for a change of atmosphere. The first scene is a jail scene where a white female is in jail after she had been put there by the so-called Sheriff, a white male, and she performs fellatio on him. The two then perform intercourse, at which

time he removes his pants and ejaculates over her buttocks. The second scene is the ranch, a so-called house of ill repute, a bedroom scene in which a white male and a white female are involved in various sexual acts including fellatio, cunnilingus and intercourse. At the end of the scene the male ejaculates in and over the female's mouth. The third scene, a bathroom scene, depicts some lesbianism involving three girls. They participate in love making, foreplay and performing cunnilingus on each other. Throughout, the movie depicts some lesbianism along with sexual acts of intercourse, fellatio and cunnilingus.

[Signature]
David J. Groblewski
Confidential Criminal
Investigator

Subscribed and sworn to before me this [21] day of November, 1983

[Signature]
Notary Public

JUSTICE MARSHALL, with whom, JUSTICE BRENNAN and JUSTICE STEVENS join, dissenting.

Under New York law, a film depicting specified sexual acts in a patently offensive manner is obscene if "the average person, applying contemporary community standards, would find that considered as a whole, its predominant appeal is to the prurient interest in sex," and if "considered as a whole, it lacks serious literary, artistic, political, and scientific value." N. Y. Penal Law §§ 235.00(1)(a), (c) (McKinney 1980). The question before this Court is whether three New York state courts erred in holding that the affidavits at issue in this case failed to establish probable cause that those standards were met.[1] The determination of what the standards of

---

[1] The New York Court of Appeals held that the third branch of the statute, providing that a film, to be obscene, must depict specified sexual acts "in a patently offensive manner, actual or simulated," § 235.00(1)(b),

§ 235.00(1) mean and how they should be applied in individual cases, of course, is in the first instance a matter of state law and the rightful province of the state courts. While the majority describes it as "clear beyond peradventure," *ante*, at 876, that the affidavits set out the requisite probable cause, I do not find that result "clear" at all, and I would not overturn the state courts' contrary judgment.

## I

The affidavits at issue in this case were first found inadequate at a suppression hearing in the Depew Justice Court. The court, per Justice Wick, noted that the issuing Magistrate had apparently not himself viewed the films, and that the retired state trooper who compiled the affidavits had "obviously paid no attention to contemporary community standards" and "made no further determination if the presentations had any literary, artistic, political or scientific value." App. to Pet. for Cert. A–37. Without stating clearly the exact basis of its decision, the court noted that "[t]he material contained [in the films] may be of the type proscribed by Section 235.05 of the Penal Law but equally, it may be . . . 'coarse, puerile, offensive and distasteful (and still not) obscene under the law or proscribable.'" *Id.*, at A–38, quoting *People* v. *Stabile*, 58 Misc. 2d 905, 296 N. Y. S. 2d 815 (N. Y. C. Crim. Ct. 1969). The court granted respondents' suppression motion.

The Erie County Court affirmed. Justice LaMendola noted the absence of a transcript of the proceedings, if any, before the issuing Magistrate, and declared it within the lower court's discretion to hold that "under New York law, the issuing magistrate had failed to make an adequate finding of probable cause . . . because he relied solely on the affidavits of the police officers without any further investigation or viewing of the materials to be confiscated." App. to Pet.

was satisfied by the descriptions in the affidavits in this case. 65 N. Y. 2d 566, 570, n. 1, 483 N. E. 2d 1120, 1123, n. 1 (1985).

for Cert. A–33. Justice LaMendola's reference to "further investigation *or* viewing" makes it plain that she did not regard the issuing Magistrate's viewing of the film as an invariable requisite to issuance of a warrant. The affidavits in this case, however, unsupported by further investigation, provided insufficient basis for a warrant authorization.

The New York Court of Appeals affirmed. 65 N. Y. 2d 566, 483 N. E. 2d 1120 (1985). The court recognized that "the task of the issuing magistrate was not to decide guilt or innocence but to determine in a preliminary way from the information submitted and available to him whether there was probable cause to believe that the material to be seized was obscene within the tripartite definition of the statute." *Id.*, at 570, 483 N. E. 2d, at 1123. Applying that standard, it held the affidavits insufficient.

Near the beginning of its opinion, the New York court reiterated this Court's recent direction that the Fourth Amendment be applied with "'scrupulous exactitude'" in cases of searches for and seizures of presumptively protected materials, *Maryland* v. *Macon*, 472 U. S. 463, 468 (1985); see also *Stanford* v. *Texas*, 379 U. S. 476 (1965), and noted a "higher standard" for warrant determinations when books and films are seized, citing *Roaden* v. *Kentucky*, 413 U. S. 496 (1973). The New York court did not go on, however, to apply any extraordinary standard of scrutiny to the determination of probable cause. Rather, its holding was a simple one: "There must be enough information before [the issuing magistrate] in one form or other . . . to enable him to judge the obscenity of the film, not of isolated scenes from it." 65 N. Y. 2d, at 571, 483 N. E. 2d, at 1124. The affidavits, the court explained, merely cataloged offensive sex acts depicted in the films. Such catalogs say nothing about the "predominant appeal" of a film, its impact "considered as a whole," or its overall literary or artistic value. "Undoubtedly, similar lists could readily be compiled by excerpting descriptions of scenes from books and movies having recog-

nized merit. Stanley Kubrick's 'Clockwork Orange' and Federico Fellini's 'Satyricon' come quickly to mind." *Ibid.* Because obscenity law requires examination of the films as a whole, the court held, probable cause cannot be inferred from the description of a few excerpted scenes. *Id.*, at 572, 483 N. E. 2d, at 1124.

## II

Taken in the abstract, the New York court's reasoning is unassailable. A mere listing of sex acts depicted in a film, or a description of excerpted scenes, says little about the predominant effect of the film considered as a whole. It says nothing about whether the film, considered as a whole, has any artistic value. And it says nothing about how the film should be regarded in light of contemporary community standards. Such a description, then, cannot establish even probable cause to believe that the film is obscene. "[S]ex and obscenity are not synonomous." *Roth* v. *United States*, 354 U. S. 476, 487 (1957).[2] A magistrate armed only with such a description cannot " 'focus searchingly on the question of obscenity,' " as the majority, *ante*, at 874, concedes he is obligated to do.

The majority's rejection of the New York court's reasoning appears to derive from a largely unarticulated feeling that that reasoning is inappropriately applied in the present case. As a result, notwithstanding the sweeping legal principles set out in the majority's opinion, the decision of this case ultimately rests on the mundane application of clear law to

---

[2] Obscene material, considered as a whole, must not only be without serious literary or other merit, but it must, applying contemporary community standards, also appeal predominantly to a "shameful or morbid" interest in sex. See *Brockett* v. *Spokane Arcades, Inc.*, 472 U. S. 491 (1985). Indeed, three of the very films described by the affidavits in this case have been declared outside the constitutional boundaries of obscenity. See *United States* v. *Various Articles of Obscene Merchandise*, 709 F. 2d 132 (CA2 1983) ("Deep Throat," "Debbie Does Dallas," and "Little Girls Blue" not obscene, applying community standards of Southern District of New York).

undisputed facts. The majority suggests that the New York court wrongly applied its law because the affidavits described more than excerpted scenes: they allowed the Magistrate to discern the " 'general theme and serious value' " of the films, and established that sex acts " 'pervaded' " each film. *Ante,* at 877.

The problem with the majority's approach is that it is unsupported in the texts of the affidavits. Although a boilerplate sentence in each affidavit invokes the "content" of the films, and two of the affidavits conclusorily assert that certain sex acts are depicted "throughout" the film, the affidavits do not attempt to describe every scene in the films or even most of the scenes. Rather, the scenes described in the affidavits are simply those the author chose to describe. While descriptions of sex acts pervade the *affidavits,* it is hardly clear that depictions of sex acts pervade the *films.* Similarly, while the "general tone" of the affidavits is clear, we have little basis for a conclusion about the "general tone" of the films.

The affidavits do not purport to be exhaustive. They can be meaningful in considering the artistic value of the films, taken as a whole, or the films' predominant appeal, only if one assumes that everything, or almost everything, worth noting in the films was incorporated into the affidavits. Nothing in the affidavits, however, justifies that assumption. The affidavits are precisely what the New York Court of Appeals condemned: mere listings of selected scenes from the films that involved depictions of sex. The films described could as well be "Last Tango in Paris."

The majority's decision upholding a warrant authorization uninformed by any information relating to crucial elements of the definition of obscenity is especially incongruous because the majority overrules the institution most closely attuned to the content of those elements: the New York courts. The New York courts are well suited to decide whether, on the basis of "contemporary community standards," the informa-

tion supporting a warrant authorization allows the magistrate to focus searchingly on the question of obscenity, and to find probable cause that given material is obscene. The New York courts have unanimously held in this case that the affidavits were insufficient to achieve that end. The majority's eagerness to reverse that fact-bound determination in order to expedite an obscenity prosecution is inappropriate and reflects a dubious notion of this Court's institutional role. Cf. *California* v. *Carney*, 471 U. S. 386, 395 (1985) (STEVENS, J., dissenting).

I dissent.